**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **HEALTHCARE MANAGEMENT AND** | ) | **CASE NO.  1:03CV0323** |
| **INVESTMENT HOLDINGS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Judge Ann Aldrich** |
| | ) | |
| **RICHARD FELDMAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| **RICHARD FELDMAN** | ) | **CASE NO.  1:04CV0883** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Judge Ann Aldrich** |
| | ) | |
| **HEALTHCARE MANAGEMENT AND** | ) | |
| **INVESTMENT HOLDINGS, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | **MEMORANDUM OF OPINION** |

This is a consolidated diversity case arising out of alleged breaches of an employment

agreement entered into by the parties.

On January 21, 2003, Richard Feldman filed a complaint in the Allegheny County Court

of Common Pleas in Pennsylvania against Healthcare Management and Investment Holdings,

LLC ("HMIH") and Zyama Goldman, M.D. raising various breach of contract and Pennsylvania

Wage Payment and Collection Law ("WPCL") claims.  On February 04, 2003, HMIH and

Goldman filed a petition for removal on the basis of diversity jurisdiction pursuant to 28 U.S.C.

§§ 1332, 1441, 1446.  On April 07, 2004, this case was transferred to the Northern District of

Ohio and assigned case number 1:04cv883.

On February 18, 2003, HMIH filed a complaint in the Cuyahoga County Court of Common Pleas in Ohio against Feldman raising various breach of contract, breach of fiduciary duty, misappropriation of trade secrets, tortious interference with business relationships, and unfair competition claims.  On February 20, 2003, Feldman filed a petition for removal on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, 1446.

These two actions have been consolidated under Lead Case Number: 1:03cv323.

On August 10, 2004, the parties, at the direction of the court, filed second amended cross complaints.  (Docket Nos. 87, 89.)[1]  On November 20, 2004, the parties filed cross motions for summary judgment.  (Docket Nos. 110, 111.)  On December 22 and 23, 2004, they filed briefs in opposition.  (Docket Nos. 118, 119.)  On January 07 and 13, 2005, they filed reply briefs. (Docket Nos. 120, 121.)

All issues have been fully briefed and are ripe for adjudication.  For the following reasons, the cross motions for summary judgment (Docket Nos. 110, 111) are each **GRANTED**, in part, and **DENIED**, in part.

## I.    FACTUAL BACKGROUND

HMIH is a limited liability company engaged in the business of selling and providing psychiatric healthcare and related services.  It is organized and existing under the laws of the State of Delaware, with a principle place of business in Shaker Heights, Ohio.  Dr. Goldman is Chairman of the Board of Directors and Marina Goldman is Vice President of Administrative Services.  Feldman was HMIH's Chief Executive Officer ("CEO") from May 04, 2002 to January 26, 2003.  Thereafter, he was CEO for Belmont Pines Hospital, a psychiatric treatment

---

[1]    In his second amended complaint, Feldman added Defendant Marina Goldman. (Docket No. 89-1.)

facility located in Youngstown, Ohio.  Presently, he lives in Costa Rica.

On May 04, 2002, Feldman and HMIH entered into an employment agreement (the "Agreement").  Under the Agreement, Feldman was restricted from engaging in any business in competition with HMIH while employed there, absent HMIH's written consent.  The Agreement provided that it could be terminated by HMIH by giving ten days notice to Feldman if he ever (1) willfully and materially breached the Agreement, (2) habitually and grossly neglected his duties, or (3) engaged in any conduct which materially damaged HMIH's reputation.  In the event of such termination, Feldman would only be entitled to salary earned prior to the date of termination.  Alternatively, the Agreement provided that Feldman could be terminated without cause with ninety days notice, in which case he would be entitled to severance pay of one year paid salary and benefits.

The Agreement also provided Feldman several benefits.  It granted him a term of employment for one year, to be renewed automatically for subsequent one-year terms.  It provided him with an annual salary of $200,000.00, term life insurance in an amount not less than $1,000,000.00, full reimbursement of his out-of-pocket medical expenses, an automobile for use while he was employed by HMIH, and short-term and long-term disability coverage.  Also, paragraph five granted him a five percent equity share in HMIH's Ohio affiliate (the "Affiliate"), which had not yet been created at the time the Agreement was executed.

Approximately two months after the execution of the Agreement, in July of 2002, Feldman and HMIH entered into a non-competition agreement (the "Restrictive Covenant").  The Restrictive Covenant was captioned "First Amendment to Employment Agreement," and it replaced the Agreement's non-competition provision.  The Restrictive Covenant prohibits

Feldman, while employed with HMIH and for a period of two years thereafter, from engaging in any business "which may compete with the business conducted by Employer or any affiliate of Employer." (Docket No. 110-3, at ¶1.) The geographic scope of the Restrictive Covenant is limited to "the State of Ohio [and] any other state where Employer or any affiliate of Employer either transacts business or is in the business of establishing business during Employee's employment by Employer." Id. HMIH alleges that, as consideration for Feldman entering into the Restrictive Covenant, it executed a "Limited Liability Company Operating Agreement" (the "Operating Agreement"), which created the Affiliate on August 12, 2002.

HMIH alleges that it trained Feldman and taught him substantial amounts of information regarding its services, business contacts, customers, and specific business practices. In addition, it alleges that Feldman was privy to a substantial amount of confidential, trade secret, and proprietary information, including information concerning its corporate structure, billing processes, health care contacts, and business strategies. It also alleges that, during his employment, Feldman was charged with opening numerous residential treatment centers throughout the state of Ohio.

On January 16, 2003, HMIH terminated Feldman's employment on ten days notice, invoking the provision of the Agreement dealing with material breach, habitual gross negligence, and damage to reputation. Feldman denies these allegations and alleges that he provided notice of termination on January 13, 2003, three days prior to HMIH's notice. He further alleges that HMIH did not provide him with all of the salary and employment benefits he was promised under the Agreement. Specifically, he alleges that HMIH did not employ him for a period of at least one year, did not provide him with term life insurance, did not reimburse him for all of his

-4-

out-of-pocket medical and hospital expenses, did not provide him short-term and long-term

disability coverage, did not purchase or lease an automobile for his use, did not pay him the

minimum required salary of $200,000, and did not provide him with severance pay.  He also

alleges that his final paycheck underpaid him for services rendered.

Accordingly, HMIH raises three breach of contract claims, one breach of fiduciary duty

claim, an unlawful misappropriation of trade secrets claim, two tortious interference with actual

and prospective business relationships claims, and an unfair competition claim.  It is seeking a

declaratory judgment that Feldman breached the Agreement, an order permanently enjoining

Feldman from further doing so, compensatory and punitive damages, and attorneys' fees and

costs.  In response, Feldman filed a counterclaim alleging that he is entitled to indemnification

for all judgments, costs, and fees incurred in this pending litigation by virtue of his status as an

officer of HMIH.  In a separate complaint, he raises two breach of contract claims and three

claims under the Pennsylvania WPCL.  He is seeking compensatory and liquidated damages, and

attorneys' fees and costs.

In its motion for summary judgment, HMIH raises three issues:

(1) Whether Feldman is entitled to indemnification?
(2) Whether Pennsylvania's WPCL applies in this case and if so, whether Feldman
is entitled to severance pay and as against Marina Goldman?
(3) Whether Feldman is entitled to severance pay under the Agreement?

In his motion for summary judgment, Feldman raises three issues:

(1) Whether HMIH's Operating Agreement protects him from liability?
(2) Whether the business judgment rule protects him from liability?
(3) Whether HMIH is entitled to injunctive relief?

The Court will address each issue in turn.

## II.    STANDARD OF REVIEW

-5-

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party moving for summary judgment has the initial burden to either (1) present affirmative evidence negating an element of the non-movant's claim or (2) demonstrate "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once that burden is met, the non-movant must set forth sufficient evidence to create a genuine issue of material fact. Klepper v. First Am. Bank, 916 F.2d 337, 342 (6th Cir. 1990). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

All reasonable factual inferences must be drawn in favor of the non-movant. Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, "the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Indeed, "[a] mere scintilla of evidence is insufficient; rather there must be evidence on which the jury could reasonably find for the non-movant." Humenny, 390 F.3d at 904 (internal quotation omitted).

When evaluating cross-motions for summary judgment, the Court is obligated to analyze each motion on its own merits and view facts and inferences in the light most favorable to the non-movant. Westfield Ins. Co. v. Tech Dry Inc., 336 F.3d 503, 506 (6th Cir. 2003).

### III.    LEGAL ANALYSIS

**A.    HMIH's Cross Motion for Summary Judgment**

     **1.    Indemnification - Counterclaim**

In response to HMIH's second amended complaint, Feldman filed a counterclaim for indemnification under HMIH's Operating Agreement for any expenses, fees, and judgment incurred in this litigation.  HMIH seeks summary judgment on the ground that Feldman is not entitled to indemnification because he is not being sued in his official corporate capacity.

Article IX, Section 2 of the Operating Agreement states in pertinent part:

> Every person who is a Member, Director or officer of the Company or a former Member, director or officer or a person who is serving or has served at the request of the Company as a member, officer, trustee, director or manager of another company is hereby indemnified against expenses, judgments, decrees, fines, penalties, or amounts paid in settlement in connection with the defense of any pending or threatened action suit or proceeding, criminal or civil, to which he, she or it is or may be made a party by reason of having been such Member, officer, trustee, director or Manager, provided he, she or it is determined by (a) Members who are not parties to or threatened with such action, suit, or proceeding ("Disinterested Members") holding a majority of the Voting Interests held by Disinterested Members; (b) a majority of the Members who are not parties to or threatened by such action, suit or proceedings; or (c) a Court of competent jurisdiction (i) not to have been negligent or guilty of misconduct in the performance of his, her or its duty to the Company; (ii) to have acted in good faith in what he, she or it reasonably believed to be in the best interest of the Company; and (iii) in any matter subject of a criminal action, suit, or proceeding, to have had no reasonable cause to believe that his, her or its conduct was unlawful.

See (Doc. No. 110-10.)  The sole issue before the Court is whether Feldman is being sued "by reason of having been" an officer at HMIH.

Per the Operating Agreement's choice of law provision, Delaware law governs this issue. See (Doc. No. 110-10, Art. XII, § 1).

Under Delaware law, "if there is a nexus or causal connection between any of the

-7-

underlying proceedings . . . and one's official corporate capacity, those proceedings are 'by reason of the fact' that one was a corporate officer, without regard to one's motivation for engaging in that conduct." Homestore, Inc. v. Tafeen, 888 A.2d 204, 215 (Del. 2005).  Thus, the Court must determine whether there is a "nexus" or "causal connection" between the claims asserted against Feldman and his official corporate capacity at HMIH.  To do so, the Court "must seek to discern the nature of the claims which [Feldman] is called upon to defend." Weaver v. ZeniMax Media, Inc., 2004 Del. Ch. LEXIS 10, *14 (Jan. 30, 2004).

Counts One, Two, and Three allege that Feldman breached his employment contract, which is separate and distinct from the Operating Agreement.  The Delaware Supreme Court has held that "[w]hen a corporate officer signs an employment contract committing to fill an office, he is acting in a personal capacity in an adversarial, arms-length transaction." Stifel Fin. Corp. v. Cochran, 809 A.2d 555, 562 (Del. 2002); see also Weaver, 2004 Del. Ch. LEXIS at *14-17. Thus, under Delaware law, corporate officers are not entitled to indemnification for alleged breaches of a separate employment contract.  Id.  Here, because Counts One, Two, and Three allege that Feldman breached a separate employment contract, he is not entitled to indemnification with respect to these three claims.

Count Four raises a breach of fiduciary duty claim.  The parties do not dispute that there is a sufficient nexus between Count Four and Feldman's official corporate capacity.  Thus, Feldman is entitled to seek indemnification with respect to this claim.

Finally, Counts Five, Six, Seven, and Eight raise misappropriation of trade secrets, tortious interference with business relationships, and unfair competition claims.  Each claim arises, in part, out of allegations that Feldman disseminated confidential and/or propriety

-8-

information after his employment with HMIH was terminated. The Delaware Court of Chancery has held that a sufficient nexus exists between such claims and one's official corporate capacity because the officer only "had access to proprietary information by reason of the fact that he was a director and officer." Brown v. LiveOps, Inc., 2006 Del. Ch. LEXIS 113, *19 (Del. Ch. Jun. 12, 2006). Here, a sufficient nexus exists between Counts Five, Six, Seven, and Eight and Feldman's official corporate capacity because he only had access to the alleged confidential and/or proprietary information by reason of the fact that he was CEO at HMIH. Thus, under Delaware law, Feldman is entitled to seek indemnification with respect to these four claims.

In sum, Feldman is not entitled to indemnification with respect to Counts One, Two, and Three, but he may seek indemnification with respect to Counts Four, Five, Six, Seven, and Eight. However, under the Operating Agreement, he will only be entitled to such indemnification if he is not found at trial (1) to be negligent or guilty of misconduct in the performance of his duties to HMIH or (2) to have acted in good faith in what he reasonably believed to be in the best interest of HMIH. See (Docket No. 110-10 Art. IX, § 2.) Thus, the motion for summary judgment with respect to the counterclaim is granted as to Counts One, Two, and Three; and denied as to Counts Four, Five, Six, Seven, and Eight.

### 2. WPCL - Counts Two, Four, and Five

#### a. Choice of Law Provision

HMIH argues that because the Agreement is expressly governed by Ohio law, the Pennsylvania WPCL is inapplicable to the instant case. Accordingly, HMIH seeks summary judgment on Counts Two, Four, and Five of Feldman's second amended complaint. Feldman counters that Pennsylvania law prohibits parties from contracting around the WPCL. Thus,

according to him, because he worked primarily in Pennsylvania, the Pennsylvania WPCL applies notwithstanding the Agreement's contrary choice of law provision.

The WPLC provides Pennsylvania employees with a statutory mechanism for collecting unpaid wages and benefits and provides for criminal penalties for non-compliance. See 43 Pa. C.S.A. § 260.1 et seq. Specifically, it requires all employers to "pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the employer." See 43 Pa. C.S.A. § 260.3. Thus, under Pennsylvania law, "when a corporation fails to pay wages and benefits that it owes its employees, the corporation's top officers can be held personally liable for the non-payments." See Belcufine v. Aloe, 112 F.3d 633, 634 (3d Cir. 1997). The WPLC defines "employer" to include "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." See 43 Pa. C.S.A. § 260.2a. It further provides that "[n]o provision of this act shall in any way be contravened or set aside by a private agreement. See 43 Pa. C.S.A. § 260.7.

Feldman argues that this latter provision precludes enforcement of the Agreement's choice of law provision. This court agrees. Section 260.7 clearly prohibits parties from contracting away an employee's statutory right to wages due. The court recognizes that "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." Kruzits v. Okuma Mach. Tool, 40 F.3d 52, 55 (E.D. Pa. 1994) (citing Smith v. Commonwealth Nat'l Bank, 384 Pa. Super. 65, 68 (Pa. Super. 1989)). However, that is not the case in the employment context when statutes are specifically designed to protect Pennsylvania employees. For example, in McIlvaine Trucking v. Workers'

-10-

Comp. Appeal Bd., 570 Pa. 662 (2002) the Pennsylvania Supreme Court voided a choice of law

provision as offending public policy in the workers' compensation context reasoning that the

relevant state statute expressly applied to all in-state injuries.  Id. at 672.

Here, like the workers' compensation statute, the Pennsylvania WPCL's underlying

purpose is to protect Pennsylvania employees.  See Killian v. McCulloch, 873 F. Supp. 938, 942

(E.D. Pa. 1995).  The term "employer" is broadly construed to include those "employing *any*

*person* in this Commonwealth."  See 43 Pa. C.S.A. § 260.2a (emphasis added).  Moreover, §

260.7 evinces the state legislature's intent in protecting Pennsylvania employees and their

statutory right to wages due regardless of any contravening private agreement with their

employers.  Thus, the court is persuaded that if the Pennsylvania Supreme Court were to address

this issue, it would follow its reasoning in McIlvaine and find that the instant choice of law

provision is void as offending public policy with respect to the Pennsylvania WPCL claims.

HMIH's citation to Tucci v. CP Kelco Aps & Lehman Bros., Inc. 2002 U.S. Dist. LEXIS

19232 (E.D. Pa. Oct. 10, 2002) is unavailing.  In Tucci, the court dismissed a Pennsylvania

WPCL claim because (1) the defendant company was located in Delaware, (2) the plaintiff

worked primarily in Delaware, and (3) the parties executed a Delaware choice of law provision.

Id. at *7-8.  The court emphasized, however, that because the plaintiff did not have an office in

Pennsylvania and was not hired to perform work in Pennsylvania, he did not establish that his

employment was based in Pennsylvania.  Id.  Here, Feldman lived and worked primarily in

Pennsylvania, paid Pennsylvania taxes, was covered under Pennsylvania's workers'

compensation statute, and for some time, his Pennsylvania home address served as HMIH's

business address.  Accordingly, Tucci is distinguishable.

-11-

In short, the Pennsylvania WPCL applies to the instant case notwithstanding the Agreement's contrary choice of law provision.  The court further notes that prior to removal from the Western District of Pennsylvania, Judge Hardiman came to the same conclusion.  <u>See</u> (Doc. No. 119-5) (adopting the magistrate judge's report and recommendation).

### b.    Unpaid Severance - Count Four

HIMH argues that because the Pennsylvania WPCL only provides a statutory right to wages earned, it does not cover Feldman's claim for severance pay because those wages were never earned.  The court disagrees.  The parties do not dispute that the Pennsylvania WPCL covers severance pay.  Indeed, § 260.2a defines "fringe benefits or wage supplements" to include "separation" pay and "any other amount to be paid pursuant to an agreement to the employee."

Thus, the sole issue is whether Feldman is entitled to severance pay under the Agreement.  Because of the Agreement's choice of law provision, the court will analyze Ohio law to interpret the contract.  <u>See</u> (Doc. No. 110-3, at ¶17.)

Under Ohio law, "'[t]he purpose of contract construction is to effectuate the intent of the parties,' and that intent 'is presumed to reside in the language they chose to employ in the agreement.'" <u>State ex. re. Petro v. R.J. Reynolds Tobacco Co.</u>, 104 Ohio St. 3d 559, 564 (2004) (<u>quoting</u> <u>Kelly v. Medical Life Ins. Co.</u>, 31 Ohio St. 3d 130, 132 (1987)).  Also, "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of the contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." <u>Layne v. Progressive Pereferred Ins.</u>, 104 Ohio St. 3d 509, 511 (2004) (<u>quoting</u> <u>Ed Schory & Sons v. Francis</u>, 75 Ohio St. 3d 433, 440 (1996)).

-12-

Because neither party maintains that the Agreement is vague and ambiguous, the court is required to enforce its terms as written.  See Ledyard v. Auto-Owners Mut. Ins. Co., 137 Ohio App. 3d 501, 505 (8th App. Dist 2000) (quoting Nationwide Mut. Ins. Co. v. Finkley, 112 Ohio App. 3d 712, 715 (9th App. Dist. 1995)).

Paragraph 13 of the Agreement covers severance pay.  There are two ways to terminate the Agreement under Paragraph 13.  First, pursuant to Subsection A, the Agreement "may be terminated by Employer by giving ten (10) days notice to Employee if Employee willfully and materially breaches this Agreement, habitually and grossly neglects the duties to be performed under Paragraph 2, or engages in any conduct which materially damages the reputation of Employer."  Second, pursuant to Subsection B, the Agreement may be terminated "by either party, without cause, by giving ninety (90) days notice to the other party."  If the employee is terminated pursuant to Subsection A, he is only entitled to "salary compensation earned prior to the date of termination as provided for in Paragraph 4 of this Agreement, computed pro rata up to and including the date of termination."  See Paragraph 13(C).  However, if he is terminated for any other reason, he is entitled to "a severance payment of one year paid salary and benefits." See Paragraph 13(D).

Here, it is undisputed that on January 13, 2003, Feldman provided advanced notice that the Agreement would not be renewed for another one-year term.  By doing so, the Agreement was effectually terminated on that date, notwithstanding the fact that Feldman intended to work until May 04, 2003.  See Paragraph 13(B) (indicating that mere notice works to terminate the Agreement.)  Upon such termination, Feldman's entitlement to severance pay vested.  It is true that three days later, HMIH sought to terminate the Agreement immediately on the grounds that

-13-

Feldman willfully and materially breached the Agreement, habitually and grossly neglected his duties, and engaged in conduct which materially damaged its reputation.  If these allegations are found to be true at trial, then Feldman is not entitled to severance pay.  If, however, they are found to be false, then Feldman is entitled to severance pay and the Pennsylvania WPCL would provide an independent statutory mechanism for relief.[2]

### c.   Marina Goldman

Finally, HMIH argues that because there is no evidence that Marina Goldman had any decision-making or policy-making authority with respect to the payment of Feldman's wages, she cannot be held liable under Pennsylvania's WPCL and should be dismissed as a party.

The term "employer" under the Pennsylvania WPCL "has been interpreted as requiring, at a minimum, some indication that the defendant employer exercised a policy-making function in the company and/or an active role in the corporation's decision making process."  Tyler v. O'Neill, 994 F. Supp. 603, 616 (E.D. Pa. 1998) (citations omitted).  The fact that one is a corporate officer or had check-writing authority is relevant but insufficient, standing alone, to establish that the officer exercised decision-making or policy-making authority.  International Ass'n of Theatrical Stage Employees, Local Union No. 3 v. Mid-Atlantic Promotions, Inc., 856 A.2d 102, 106 (Pa. Super. 2004).  Rather, to sustain an action under the Pennsylvania WPCL, a

---

[2]     HMIH's citation to Allende v. Winter Fruit Distribs., Inc., 709 F. Sup.. 597 (E.D. Pa. 1989); Barsky v. Beasley Mezzanine Holdings, L.L.C., 2004 U.S. Dist. LEXIS 17166 (E.D. Pa. Aug. 30, 2004); and Scully v. O'Hare, 1999 U.S. Dist. LEXIS 13007 (E.D. Pa. Jul. 27, 1999) is unavailing.  In Allende and Barksy, the plaintiffs each sought unpaid wages that they *would have* received had their employment not been terminated.  In Scully, the plaintiff sought an unpaid stock option, but the court concluded that since payment was not yet due and the dollar value was undetermined, no wages had been earned.  Here, however, upon his notice of termination, Feldman's entitlement to severance pay vested, which constitutes wages earned and is clearly covered under the Pennsylvania WPCL.

-14-

plaintiff must show that the employer "was *actively involved* in corporate policy-making, such as corporate decision-making or corporate advisement on matters of pay or compensation." Id. (emphasis added.)  Thus, the sole issue is whether there is sufficient evidence to create a genuine issue of material fact as to whether Marina Goldman had any such authority.

Here, Feldman has set forth evidence establishing that Marina Goldman was the Vice President of Administrative Services, one of seven members of the Board of Directors, and had check-signing authority.  Moreover, Alla Carran, HMIH's former Human Resources consultant, provides some support for the assertion that Marina Goldman had decision-making authority. Indeed, according to Ms. Carran, Dr. and Mrs. Goldman informed her that "*they* would not be reimbursing [Feldman]," that "*they're* direction was to not reimburse," that "*they* were not planning to honor [the life insurance obligation]," and that "*they* said *they* were changing [Feldman's] employment agreement."  See (Doc. No. 119-9 "Carran Depo.," at 13-20 (emphasis added)).

In construing these facts in a light most favorable to Feldman, the court concludes that he has set forth sufficient evidence to create a genuine issue of material fact as to whether Marina Goldman had decision-making or policy-making authority at HMIH.  The motion for summary judgment, with respect to her, is denied.

### 3.    Breach of Contract Severance Claim - Count Three

With respect to Count Three of Feldman's second amended complaint, HMIH argues that because Feldman materially breached the Agreement by (1) violating the non-compete provision and (2) refusing to work a full one-year term, it is entitled, as a matter of law, to deny Feldman any claim to severance.

HMIH is correct that under Ohio law, a material breach of contract by one party generally discharges the non-breaching party from performance of the contract.  See Nious v. Griffin Constr., Inc., 2004 Ohio 4103, ¶16 (10th App. Dist. 2004) (citations omitted).  However, HMIH's aforementioned arguments are both factually incorrect.  With regard to the first argument that it was justified to withhold severance because Feldman allegedly violated the non-compete provision, it is undisputed that HMIH's decision to terminate Feldman and withhold severance occurred *before* Feldman accepted employment with an alleged competitor.  Thus, HMIH cannot now maintain that its decision to deny severance pay was *in response to* Feldman's alleged breach of the non-compete provision.  With regard to the second argument that it was justified to withhold severance because Feldman breached the Agreement by refusing to work a full one-year term, it is undisputed that Feldman agreed to work until May 04, 2003.  Paragraph Three of the Agreement is quite clear that "[t]he term of employment shall begin on the date of this Agreement."  The Agreement was executed on May 04, 2002.  See (Doc. No. 110-3, at 1.)  Thus, the term of employment began on May 04, 2002, notwithstanding the fact that his actual duties did not begin until May 29, 2002.  Feldman agreed to work until May 04, 2003 and thus, no breach occurred.  Because both of HMIH's arguments are factually incorrect, the motion for summary judgment with respect to Count Three is denied.  The court also notes that HMIH does not pursue either of these two arguments in its reply brief.

In conclusion, HMIH's cross motion for summary judgment is granted with respect to the counterclaim as against Counts One, Two, and Three; and denied with respect to all other issues.

**B.    Feldman's Cross Motion for Summary Judgment**

**1.    Operating Agreement**

With respect to Counts One, Two, Three, and Four of HMIH's second amended complaint, Feldman argues that the Operating Agreement limits his liability because he was acting within the scope of his authority as CEO.

Article III, Section Fifteen of the Operating Agreement states in pertinent part:

To the fullest extent permitted under the Act, the Delaware General Corporation Law or any other applicable law as currently or hereafter in effect, neither the Officers nor the Directors, nor any Affiliate of any Officer of Director shall be personally liable, responsible or accountable in damages or otherwise to the Company for any of its Members for or with respect to any action taken or failure to act on behalf of the Company within the scope of authority conferred on such Officer or Director by this Agreement or by law.  In addition to, and not by way of limitation of, the preceding sentence, no Officer or Director shall be liable to the Company or its Members for monetary damages for breach of fiduciary duty as a Director or an Officer, except for liability (i) for any breach of the Director's or Officer's duty of loyalty to the Company or its Members or (ii) for acts or omissions not in good faith or which involve gross negligence, intentional misconduct or a knowing violation of law.

(Doc. No. 110-10.)  Thus, liability is limited when a corporate officer is acting within the scope of his authority, except for (1) breaches of the duty of loyalty, (2) acts or omissions not in good faith, (3) acts or omissions which involve gross negligence, or (4) acts or omissions which involve intentional misconduct or a knowing violation of the law.

Per the Operating Agreement's choice of law provision, Delaware law governs this issue. See (Doc. No. 110-10, Art. XII, § 1).  Under Delaware law, similar to Ohio law, clear and unambiguous language should be given its ordinary and usual meaning.  Rhone-Poulenc Basic Chems. Co. v. American Motorist Insur. Co., 616 A.2d 1192, 1195 (Del. 1992).

Here, the Operating Agreement's limitation of liability provision only serves to eliminate liability for actions taken within the scope of authority "conferred on such Officer or Director *by this Agreement or by law*."  (Doc. No. 110-10, Art. III, § 15 (emphasis added.))  However, with respect to Counts One, Two, and Three, HMIH is not suing Feldman for actions taken within the

-17-

scope of his authority conferred on him by the Operating Agreement; it is suing him for actions

taken within the scope of his authority conferred on him by a separate employment contract.

This distinction is critical.  As the Delaware Supreme Court stated:

> When a corporate officer signs an employment contract committing to fill an office,
> he is acting in a personal capacity in an adversarial, arms-length transaction.  To the
> extent that he binds himself to certain obligations under that contract, he owes a
> personal obligation to the corporation.  When the corporation brings a claim and
> proves its entitlement to relief because the officer has breached his individual
> obligations, it is problematic to conclude that the suit has been rendered an "official
> capacity" suit subject to indemnification under § 145 and implementing bylaws.
> Such a conclusion would render the officer's duty to perform his side of the contract
> in many respects illusory.

Stifel, 809 A.2d at 562.  Although the Stifel court was analyzing an indemnification provision,

this court sees no reason why the same analysis would not apply equally to a limit of liability

provision.  Indeed, if Feldman is able to use the limit of liability provision to exculpate himself

for violations of his separate employment contract, his duty to perform under that contract is

illusory at best.  Thus, the court concludes that HMIH's Operating Agreement does not serve to

limit Feldman's liability with respect to Counts One, Two, and Three, because those claims

allege violations of a separate employment contract.

Count Four, however, raises several breaches of the fiduciary duties of care, loyalty, and

to refrain from self-dealing.  Breaches the duty of loyalty and to refrain from self-dealing are

expressly excepted from the Operating Agreement's limit of liability provision.  See (Doc. No.

110-10 Art. III, § 15.)  Thus, that provision does not serve to limit Feldman's liability with

respect to those aspects of Count Four.

With respect to breaches of the duty of care, the limit of liability provision also excepts:

"acts or omissions not in good faith or which involve gross negligence, intentional misconduct or

a knowing violation of law." <u>See</u> (Docket No. 110-10 Art. III, § 15.)  Here, HMIH has set forth

sufficient evidence establishing that Feldman (1) failed to set up any organized structure for the

company; (2) failed to procure the requisite license before entering into the Andover project,

which had to be canceled, costing lots of money and professional embarrassment; (3) failed to

prepare a budget or any financial statements; (4) organized an open house in Columbus and

announced that patients were being accepted without even applying for the requisite license,

causing professional embarrassment and placing HMIC on probation, (5) instructed employees

not to inform the board of directors about problems that were taking place with projects; and (6)

never opened a single facility during his tenure as CEO.  <u>See</u> (Doc. No. 108 "Goldman Depo.,"

at A19-A20; Doc. No. 108 "Sykes Depo.," at A116-A118; A122.)  According to Dr. Goldman,

once the Andover project fell through, "nobody wanted to deal with us." <u>Id.</u>

The court concludes that when viewing this evidence in a light most favorable to the non-

movant, HMIH, a rational trier of fact could conclude that Feldman engaged in conduct that

constitutes gross negligence.  Accordingly, the motion for summary judgment with respect to

Count Four is denied.

**2.    Business Judgment Rule**

Feldman also seeks summary judgment on Count Four on the ground that Delaware's

business judgment rule protects him from liability.

The business judgment rule is a common-law recognition of the statutory authority to

manage a corporation that is vested in the board of directors.  <u>Omnicare, Inc. v. NCS Healthcare,</u>

<u>Inc.,</u> 818 A.2d 914, 927 (Del. 2003) (<u>quoting</u> <u>MM Cos. v. Liquid Audio, Inc.,</u> 813 A.2d 1118,

1127 (Del. 2003)).  It is a "presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Id. (Quoting Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d 1361, 1373 (Del. 1995)).  "An application of the traditional business judgment rule places the burden on the 'party challenging [a] decision to establish facts rebutting the presumption.'" Id. at 927-28 (quoting Unitrin, 651 A.2d at 1373).  The rule is intended to be highly deferential.  Indeed, "[u]nless the procedural presumption of the business judgment rule is rebutted, a 'court will not substitute its judgment for that of the [officer] if the . . . decision can be attributed to any rational business purpose.'" Id. at 928 (quoting Unitrin, 651 A.2d at 1373).

To rebut the rule, the plaintiff has the initial burden of providing evidence that the defendant, in reaching the challenged decision, "breached any one of the triads of [his] fiduciary duty -- good faith, loyalty or care." Cede & Co. v. Technicolor, 634 A.2d 345, 361 (Del. 1993). For example, if an officer makes "an uninformed business judgment under circumstances constituting gross negligence, that decision would not be protected under the business judgment rule and may give rise to an actionable claim." Lewis v. Honeywell, Inc., 1987 Del. Ch. LEXIS 458, *10 (Del. Ch. Jul. 28, 1987).

Here, because an issue of material fact exists as to whether Feldman engaged in gross negligence, the business judgment rule does not protect him from liability.  See Lewis, 1987 Del. Ch. LEXIS at *10.  The motion for summary judgment with respect to Count Four is denied.

### 3.  Injunctive Relief

Finally, with respect to HMIH's request for injunctive relief, the court recognizes that the Restrictive Covenant's non-compete provision was set to expire on or about January 26, 2005. See (Doc. Nos. 110-4, 110-6.)  Thus, to the extent that Counts One and Two seek injunctive

-20-

relief to enforce compliance with this provision, that request is now moot.  Thus, the motion for summary judgment with respect to Counts One and Two is granted, solely with regard to the issue of injunctive relief and the Restrictive Covenant's non-compete provision.

In conclusion, Feldman's cross motion for summary judgment is granted with respect to Counts One and Two solely with regard to the issue of injunctive relief and the Restrictive Covenant's non-compete provision and denied with respect to all other issues.

## IV.  CONCLUSION

For the foregoing reasons, the cross motions for summary judgment are each **GRANTED**, in part, and **DENIED**, in part.  Specifically, HMIH's cross motion for summary judgment is granted with respect to Feldman's counterclaim as against Counts One, Two, and Three and denied with respect to all other issues; and Feldman's cross motion for summary judgment is granted with respect to Counts One and Two solely with regard to the issue of injunctive relief and the Restrictive Covenant's non-compete provision and denied with respect to all other issues.

IT IS SO ORDERED.

        /s/ Ann Aldrich
UNITED STATES DISTRICT JUDGE

Dated: September 15, 2006